ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-40154-01-JAR |
| ) | |
| SERGIO PULIDO-VASQUEZ, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

This matter comes before the Court on defendant Sergio Pulido-Vasquez's Motion to Suppress. (Doc. 24.) Defendant moves to suppress evidence obtained after a traffic stop and subsequent search of a vehicle he was riding in on November 11, 2005. The Court held a hearing on defendant's motion on May 30 and June 6, 2006. After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule. For the reasons stated below, defendant's motion to suppress is denied.

## I.  Factual Background

On November 11, 2005, Kansas State Patrol Trooper Clint Epperly, a drug interdiction trooper, stopped a  black Ford Explorer with a Minnesota license plate along Interstate 35 North at approximately 11:00 p.m. Trooper Epperly stopped the vehicle at milepost 128 in Lyon County, Kansas, for crossing the white "fog line" and driving on the shoulder of the interstate for a period of about two seconds. Trooper Epperly testified at the hearing that the road conditions were clear, there was no wind, and the road was relatively level with no curves. He witnessed no evasive behavior by the driver of the Explorer nor saw any external conditions that would have

led the vehicle to cross the fog line.

Trooper Epperly encountered two individuals in the vehicle. The driver identified himself with a California driver's license as defendant Jonathan L. Medina and the passenger identified himself with Mexican identification as defendant Sergio Pulido-Vasquez. When Trooper Epperly inquired about who owned the vehicle, one of the defendants responded "Oswaldo."

Trooper Epperly approached the vehicle on the passenger side and asked defendants a series of questions about their travel plans. On the way to the vehicle, he shined his flashlight in the back of the vehicle and noticed that there was no luggage, but only a coat in the back seat. Trooper Epperly asked the defendants if they spoke English, and one of them told him "a little." Trooper Epperly spoke in a combination of Spanish and English to the defendants throughout the traffic stop. He testified that "his Spanish is not that good," and that he generally asked Spanish-speaking individuals "broad" questions such as where they stayed and where they were coming from. He testified that he knew enough Spanish to ask about basic travel plans and the he has a good sense of whether an individual is completely unable to understand his questions.

Trooper Epperly asked where they were staying and for how long. They told him Wichita, where they had taken Pulido-Vasquez's mother from Minnesota to see his sister. One of the defendants told the trooper that they were in Wichita "yesterday" and could not remember the sister's address, but that it was off the K-15 exit.

Trooper Epperly then asked Medina to step into the patrol car for the purpose of issuing a warning. He continued to ask Medina questions in English and at times incorporated Spanish words into his questions. Medina answered Trooper Epperly's questions with a heavy Spanish

accent and often did not seem to either know or understand the question. Trooper Epperly asked Medina what the passenger's name was and he replied with what sounded like "Yu Yu."[1] Trooper Epperly told Medina that he had "failed." Then, he asked Medina in Spanish what Pulido-Vasquez's mother's name was. Trooper Epperly asked Medina if she had a nickname, and then asked what he "called her." He repeated "nombre de madre." Sounding confused, Medina repeated the questions and said that he didn't know. Trooper Epperly asked him where he stayed in Wichita, incorporating "donde" into his question and asked if he stayed in a hotel. Medina denied that he stayed in a hotel, and said that they stayed in a "casa." Medina told him he did not know Pulido-Vasquez's sister's name, but that he thought they stayed with his uncle, "I think Peter or something like that." During the encounter in the patrol car, a voice from dispatch informed Trooper Epperly that the Explorer was titled to someone named Oswaldo in Minnesota.

Trooper Epperly then left Medina in the patrol car and walked over to talk to Pulido-Vasquez, who was still sitting in the passenger seat of the Explorer. He asked Pulido-Vasquez the same questions that he had asked Medina, and additionally asked if the pair had stayed with his uncle. Pulido-Vasquez stated that he did not have an uncle who lived in Wichita, only a sister and brother-in-law. He told Trooper Epperly that he and Medina stayed with his sister and brother-in-law at their apartment.

Trooper Epperly returned to his patrol vehicle and asked Medina again where he slept in Wichita. Medina replied that he stayed "on the house" and that he thought it was the uncle of Pulido-Vasquez, and that he thought his uncles's name was Peter. Trooper Epperly returned all

---

[1] Defendant maintains that on the tape, it sounds like Medina says "Julio." Pulido-Vasquez testified that "Yu Yu" is his nickname.

of Medina's documentation and explained to Medina that he was giving him a warning.  Then, Trooper Epperly stated: "That's all I got.  You're free to go.  Adios.  Do you have any questions?  Well, now that you're free to go, now can I ask you a couple of questions?"  Medina replied, "O.K."  Trooper Epperly asked if it was "O.K. for me to buscar su carro?"  Medina responded: "Yeah, that's fine."  Trooper Epperly got out of the patrol vehicle and allowed Medina to get out as well.  Trooper Epperly returned to the Explorer and told Pulido-Vasquez, "I told [Medina] we have a bad drug problem.  I noticed you guys went down there pretty quick.  Can I search for drugs?"  He told Trooper Epperly that he did not have a problem with him searching, and Trooper Epperly repeated, "You don't have a problem with it?"  Pulido-Vasquez said, "No." Trooper Epperly patted down both defendants and asked them to stand in front of the Explorer while he searched

     Trooper Epperly began the search at 11:19, approximately fifteen minutes after stopping the defendants.  After opening the rear hatch of the Explorer, Trooper Epperly noticed that the carpet was placed just over the tie-down hooks, which in his experience, was not typical of how a factory or professional would lay the carpet.  He also noticed that the mat underneath the carpet was glued down.  When he lifted it up, he saw what appeared to be a trap door on hinges.  Trooper Epperly then drew his duty weapon; he ordered both defendants to lie on the ground and handcuffed them. Trooper Epperly then utilized a drug-detection dog, Ranger, to conduct a sniff of the vehicle.  The dog positively alerted to the rear floor of the vehicle and Trooper Epperly ultimately located five tupperware containers of methamphetamine.

## II.  Discussion

### A.  The Initial Stop

Defendant argues that the stop was pretextual because Trooper Epperly called dispatch to check the Explorer's license plates before stopping the vehicle and because the Explorer crossed the fog-line as a reaction to the Trooper following too closely behind. The government argues that Trooper Epperly had a valid basis for the initial stop because he observed the Explorer cross the fog line, in violation of K.S.A. § 8-122, for failure to maintain a single lane of traffic.

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[2] The principles of *Terry v. Ohio*[3] apply to such traffic stops. The reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[4] Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[5] Specifically, the stop is valid if "the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[6]

Trooper Epperly based the traffic stop on an observed traffic infraction. He witnessed Medina violate a state statute that requires all vehicles maintain a single lane of traffic. Under

---

[2] *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[3] 392 U.S. 1 (1968).

[4] *Id*. at 19-20.

[5] *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[6] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996).

Kansas law, "A vehicle shall be driven as nearly as practicable entirely within a single lane . . . ."[7]  Failure to maintain a single lane of traffic, like any other traffic violation, can be a legitimate basis for officers to effectuate a traffic stop.  In fact, the officer need only have a reasonably articulable suspicion of the violation.

Trooper Epperly testified that he initially saw the Explorer at a toll gate and noticed it had a Minnesota license plate.  He followed the Explorer for about one mile before stopping it.  Prior to the traffic stop, Trooper Epperly pulled up in the left lane beside the Explorer and ran the license plate number through dispatch.  Then, he testified that he dropped back and moved back into the right lane, behind the Explorer.  Trooper Epperly then observed the Explorer cross onto the shoulder of the road once for a period of seconds and then correct itself.

The fact that Trooper Epperly ran the Explorer's license plate through dispatch does not support a finding that the initial stop of the Explorer was not valid.  There is nothing inappropriate about this action, even if it was pretextual.  An officer's subjective motives are irrelevant when conducting a traffic stop.[8]  The idea that the stop was pretextual holds no legal significance because pretextual stops are legal when a traffic violation has occurred.[9]

Pulido-Vasquez directs the Court to *United States v. Gregory*,[10] where the Tenth Circuit applied a similar Utah statute and found that a single occasion of crossing over the fog line does not justify a traffic stop.  In fact, the Tenth Circuit explained in *Gregory* that the phrase "as

---

[7]K.S.A. § 8-1522(a).

[8]*Botero-Ospina*, 71 F.3d at 787.

[9]Pretextual stops have long been held legal since the seminal decision of *Whren v. United States*, 517 U.S. 806 (1996).

[10]79 F.3d 973, 977 (10th Cir. 1996).

nearly as practicable" in the statute precludes an absolute standard, and instead, required a fact-specific inquiry "to assess whether an officer has probable cause to believe a violation has occurred."[11]  Trooper Epperly observed the Explorer drift onto the shoulder of the road under good road and weather conditions.  Trooper Epperly testified that the weather was clear, it was not raining, and that the road was relatively level with few curves.  He did not observe any external factors that may have caused Medina to drift into the shoulder of the road.[12]

Pulido-Vasquez argues in his post-hearing memorandum that Trooper Epperly was following the Explorer so closely that he caused Medina to cross over the fog line.  Pulido-Vasquez testified that Trooper Epperly's act of speeding up next to the Explorer, and then braking to drive closely behind it startled Medina into crossing onto the shoulder.  If Trooper Epperly "caused or contributed to causing the drift . . . under the circumstances, [it] does not constitute a violation."[13]

Defendant argued at the evidentiary hearing that the videotape of the traffic stop shows that Trooper Epperly could not have been following more than fifty feet behind the Explorer. Other than this conclusory assertion, the Court does not find convincing evidence that Trooper Epperly caused the traffic infraction. Trooper Epperly could not recall how many feet behind the Explorer he was driving when the Explorer crossed the fog line.  And, the Court finds it impossible to tell from the videotape how close the Trooper was following.  The quality of the

---

[11]*United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999) (discussing K.S.A. § 8-1522); *see also United States v. Rios*, No. 05-40005-SAC, 2005 WL 3132328 (D. Kan. Nov. 22, 2005).

[12]*See Gregory*, 79 F.3d at 978 (finding no violation where the vehicle was traveling on a winding, mountainous road).

[13]*United States v. Ochoa*, 4 F. Supp. 2d 1007, 1012 n.4 (D. Kan. 1998); *see also Ozbirn*, 189 F.3d at 1199.

7

tape is poor, and it appears not to begin until after the violation occurred. The beginning of the tape shows the Explorer in front of the camera with its right turn signal on, pulling over to the side of the turnpike. The Court lacks a basis to conclude that a reasonable driver would have been so distracted by the presence of the trooper behind him that he would drift off of the road. Under the circumstances, the Court finds that Trooper Epperly possessed an articulable suspicion that a traffic violation had occurred; therefore, the initial stop was valid.

### B. Length of Detention

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[14] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[15] An officer may lengthen the detention for questioning or investigation unrelated to the reason for the initial stop: (1) where the detention has become consensual; or (2) if not consensual, where the officer has "'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring' in order to justify detaining an individual for a period of time longer than that necessary to review a driver's license and vehicle registration, run a computer check, determine that the driver is authorized to operate the vehicle, and issue the detainee a citation."[16] Officers may also question a vehicle's occupants about travel plans, their identities, and ownership of the vehicle without improperly

---

[14] *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[15] *United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[16] *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998) (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)); *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

expanding the length of detention.[17]   Pulido-Vasquez objects to the length of his detention. He argues that Trooper Epperly went beyond asking him and Medina questions about travel plans because he asked them both questions about how they knew one another, whether they were related, their criminal history, and where they worked. The government argues that Trooper Epperly had the requisite reasonable suspicion to further detain Medina and Pulido-Vasquez based on: (1) the defendants' inconsistent answers to questions about travel plans, and (2) the fact that neither defendant owned the vehicle. The Court agrees. Notably, the fact that neither occupant could prove that he was entitled to operate the Explorer provided Trooper Epperly with reasonable suspicion to further detain them.[18] The Court also finds that the inconsistent responses to permissible travel questions provided reasonable suspicion; therefore, any delay in detention was justified.

Pulido-Vasquez argues that many of the bases for reasonable suspicion cited by Trooper Epperly were formed by incorrect translations of answers that defendants provided to his questions in Spanish. For example, when Medina told Trooper Epperly that they stayed at Pulido-Vasquez's uncle's house, he stated that he thought the uncle's name was Peter. Pulido-Vasquez elicited testimony from Jesse Ybarra, a witness who is fluent in Spanish, that Peter is the English translation for the name "Pedro," which Pulido-Vasquez testified is his brother-in-law's name. Also, Ybarra testified that the word "casa" often has more than one meaning and that it can refer to an apartment. The Court will address the language barrier issue in more

---

[17]*Cervine*, 347 F.3d at 871; *United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003).

[18]*E.g.*, *United States v. Santana-Garcia*, 263 F.3d 1188, 1193 (10th Cir. 2001); *United States v. Galindo-Gonzales*, 142 F.3d 1217, 1223–24 (10th Cir. 1998) (explaining that failure to produce proof of ownership provides an officer has with reasonable suspicion that the vehicle could be stolen, which justifies further investigation).

detail when it discusses consent, but finds that any inaccurate translation by Trooper Epperly failed to defeat his reasonable suspicion of criminal activity. Regardless of any language barrier, the lack of authority to operate the Explorer provided Trooper Epperly with the requisite reasonable suspicion. Also, the Court finds Trooper Epperly's testimony credible that he believed, based on his experience, that the defendants understood his questions and were merely stalling by not directly responding. Therefore, the Court finds that Trooper Epperly had sufficient reasonable suspicion to extend the length of the detention by less than fifteen minutes to further investigate the ownership of the vehicle and to clarify discrepancies in the defendants' answers to similar questions.

### C. Consent

A search authorized by consent is wholly valid and a well-recognized exception to the prohibition against warrantless searches.[19] "Valid consent is consent which is freely and voluntarily given."[20] Voluntariness of consent is a question of fact to be determined from all the circumstances; a court should neither presume that the consent was voluntary nor involuntary.[21] The government bears the burden of proving that consent was voluntary.[22] To satisfy this burden, the government must show that the consent was unequivocal and specific and freely and voluntarily given.[23] Mere submission to lawful authority does not equate to valid consent.[24]

---

[19] *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041 (1973).

[20] *Patten*, 183 F.3d at 1194.

[21] *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).

[22] *Patten*, 183 F.3d at 1194.

[23] *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998).

[24] *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993).

Language barriers are relevant in evaluating a defendant's ability to act knowingly, intelligently, and voluntarily.[25]

Pulido-Vasquez makes a general argument that neither he nor Medina have a working knowledge of the English language, therefore, neither defendant gave valid consent for Trooper Epperly to search the vehicle. But Pulido-Vasquez does not contend that he did not understand the request for consent to search. The examples provided in the motion relate to Trooper Epperly's questions that took place during the defendants' initial contact with Trooper Epperly. Still, many of Pulido-Vasquez's answers to these questions were in English. The Court finds that Pulido-Vasquez understood enough English to respond to Trooper Epperly's request for consent.[26] He told Trooper Epperly twice that he did not mind if he searched the vehicle. His answers in English to the trooper's questions are evidence that he understood the questions. Further, Pulido-Vasquez's conduct shows that he consented to a search of the vehicle, as he stood by in front of the vehicle while the officer searched.[27]

Finally, the Court notes that Trooper Epperly had already obtained consent from Medina, the driver of the vehicle, before asking Pulido-Vasquez for consent. And, Trooper Epperly asked and received consent from Medina in Spanish, which Pulido-Vasquez does not challenge. "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient

---

[25] *United States v. Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995), *aff'd*, 103 F.3d 145 (10th Cir. 1996).

[26] *See United States v. Guerrero*, 379 F. Supp. 2d 1138, 1146 (D. Kan. 2005).

[27] *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990–91 (10th Cir. 1993)

11

relationship to the premises or effects sought to be inspected."[28]  Under the common authority doctrine, Pulido-Vasquez did not possess an expectation of privacy in the Explorer that negated Medina's consent to search.[29]

### D.  Arrest

Defendant argues that his arrest, after Trooper Epperly discovered the hidden compartment in the Explorer, was illegal.  "An officer has probable cause to arrest an individual when all of the facts and circumstances would lead a reasonable person to believe that an offense has been or is being committed."[30]  The Court must examine the facts as they would have appeared to a prudent, cautious, trained police officer.[31]  The Tenth Circuit has held that "the apparent existence of a hidden compartment to contain contraband is sufficient to create probable cause to arrest a defendant."[32]  The Court finds that discovery of the hidden compartment, along with the other indicia of reasonable suspicion based on the defendants' answers to questions about their travel plans and their identities, was sufficient to establish probable cause necessary to arrest Pulido-Vasquez.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Pulido-Vasquez's Motion to Suppress is **denied**.

---

[28]*United States v. Matlock*, 415 U.S. 164, 171 (1974); *see United States v. Campos-Campos*, 198 F.3d 259, 1999 WL 987359 (10th Cir. Nov. 1, 1999) (table decision) (explaining that the passenger does not have common authority over the automobile when neither occupant owns the vehicle).

[29]*See United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999), *cert. denied*, 528 U.S. 827 (1999).

[30]*United States v. Davis*, 87 F. App'x 94, 98 (10th Cir. 2004); *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001).

[31]*United States v. Maher*, 919 F.2d 1482, 1485 (10th Cir. 1990).

[32]*United States v. Morse*, 15 F. App'x 590, 596 (10th Cir. 2001); *United States v. Soto*, 988 F.2d 1548, 1558–59 (10th Cir. 1993); *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990).

**IT IS SO ORDERED**.

Dated this  26th  day of June 2006.

                                            **S/ Julie A. Robinson**
                                            **Julie A. Robinson**
                                            **United States District Judge**

*Order Denying Motion to Suppress*, United States v. Pulido-Vasquez, 05-40154-01-JAR.